Toomey, J.
PROCEDURAL BACKGROUND
Plaintiff (hereinafter, “Fleming") lodged her complaint against defendant (hereinafter, “Quinlivan”) in the Worcester Superior Court on June 10, 1998. Subsequent filings included Quinlivan’s Answer and Counterclaim, Fleming’s First Supplemented Complaint, Quinlivan’s Answer and Counterclaim to Fleming’s First Supplemented Complaint, Quinlivan’s First Supplemented Counterclaim and Fleming’s Answer to Defendant’s First Supplemented Counterclaim. In an effort to simplify the thrust and parry obscured by the foregoing, the Court offers the following encapsulation of the several theories of recovery advanced by the parties’ pleadings.
FLEMING’S COMPLAINTS
I. Declaration of Common Driveway Easement Rights and Injunction against Violation thereof by Quinlivan.
II. Intentional Infliction of Emotional Distress upon Fleming by reason of Quinlivan’s conduct in response to parking, by Fleming’s guests, on or about the common driveway.
III. Breach of Warranty in connection with Quinlivan’s obligations to effect certain landscaping on Fleming’s property.
IV. Unfair or Deceptive Acts or Practices by Quinlivan in violation of G.L.c. 93A.[1]
V. (Supplemental Complaint) Trespass by Quinlivan upon Fleming’s property.[2]
QUINLIVAN’S COUNTERCLAIMS
I. Trespass by Fleming.[3]
II. Breach by Fleming of covenants restricting parking in the common driveway.
III. Negligence by Fleming in over-burdening the parking capacity of the common driveway.
IV. Intentional Infliction by Fleming of Emotional Distress upon Quinlivan through various incidents of anti-social conduct.
V. Intentional Interference by Fleming with Quinlivan's Contractual or Other Advantageous Relationships.[4]
VI. (Supplemental Counterclaim) Trespass by Fleming to Quinlivan’s chattels, to wit removal of boundary markers.[5]
VII. (Supplemental Counterclaim) Breach by Fleming of her covenant to pay her proportionate share of the maintenance of the common driveway.
The reciprocal accusations were tried, jury-waived, on February 12, 2001, through February 16, 2001. The evidence received at the trial, preceded by a view, has. resulted in the Court’s finding of the following facts.
FACTS
The Sale
1. On November 20, 1996, the parties executed a purchase and sales agreement for Lot 1, 91 Hill Street, Shrewsbury, MA. The agreement expressly referenced an attached “Declaration of Restrictive Covenants . . . to be recorded at the Worcester District Registry of Deeds.”
2. On November 22, 1996, the Declaration of Restrictive Covenants was recorded in the Worcester District Registry of Deeds.
*579 3. On November 22, 1996, a deed was recorded in the Worcester Registry of Deeds transferring title of the property from Quinlivan to Fleming “subject to Declaration of Restrictive Covenants recorded herewith as Instrument No. 129593 [except Restrictions numbered 1 and 4].”
4. The November 20, 1996, purchase and sale agreement placed upon Fleming “the responsibility for germination of seed and successful growth of grass remains on the homeowner. ” (Exh. D, ¶ 8.) With respect to shrubbery, the agreement provided that “no warranty exists as to the length of life." (Exh. D, ¶9.)
5. A November 4, 1996, writing bearing only the signature of Quinlivan and apparently drafted by Fleming as a memorandum of certain of the pre-contract negotiations, recites, inter alia, that Quinlivan is to deliver “a seeded and germinated lawn by May 31, 1997, if not sooner dependent upon weather and temperature conditions.” Nothing in the subsequent purchase and sale agreement incorporates by reference the November 4, 1996, writing, and the agreement expressly provides that, “This Agreement is entered into by the parties ... without reliance on any representation made as to the character or quality of the property . . . except as stated in this Agreement.”
The Restrictive Covenants
6. The November 22, 1996, Restrictive Covenants provided, in pertinent part, “The grantor [Quinlivan] reserves the right in its sole discretion to change . . . these restrictions . . . [provided, however, that] after all the lots . . . have been sold by the Grantor, these covenants may be amended ... by an instrument signed by two thirds or more of the then owners of the lots ...”
7. On October 21, 1997, Quinlivan recorded in the Registry of Deeds a “First Amendment to Declaration of Restrictive Covenants” which recited, inter alia, that, “No vehicles will be parked on the easement serving the property . . .,” and which required that, after sale of all lots, any amendments to the covenants be approved by all lot owners.
The Declaration of Easement
8. The Declaration of Easement, recorded by Quinlivan in November 1996,[6] established a thirty-foot wide, non-exclusive easement running from Hill Street to the rear of Quinlivan’s parcel and was intended to serve Lots 1,2 and 3 with a sixteen-foot wide paved common driveway flanked, on each side, by a seven-foot wide grass strip. The purpose of the easement was stated as “for pedestrian and vehicular ingress and egress . . . over and across the common drive and from Hill Street and to and from Lots 1,2, and 3.” Additionally, the Declaration provided that, “Nothing contained herein shall limit any other owner of Lots 1, 2 and 3 from . . . making any use of such common easement area not inconsistent with the reasonable enjoyment of the use of said common easement area for the purposes hereinabove set forth . . .” Finally, the Declaration required that the owners of Lots 1, 2 and 3 be responsible each for one-third of the costs of ." . . removing snow and ice, salting and sanding, lawn care, landscaping and all other measures reasonably necessary for the maintenance of safe vehicular and pedestrian access to Lots 1, 2 and 3."
9. The property conveyed to Fleming — Lot 1 — had been carved from a larger parcel owned by Quinlivan. He had subdivided his parcel into three lots situated in a roughly perpendicular fashion with the result that all three lots had access to the nearest public way only via the easement — running along the “tail" of Lot 3 (the top lot) and beside Lot 2 (the middle lot) and Lot 1 (the bottom lot) — to Hill Street. Quinlivan retained Lot 3 for his residence, sold Lot 2 to a buyer not involved in the instant litigation and sold Lot 1 to Fleming. The result of the awkward configuration of the premises (see trial exhibit 7 attached hereto) was the circumstance that the bottom lot’s access to the easement portended near-inevitable clashes with the uses of the easement by the occupants of the middle and top lots. The instant squabbling and litigation demonstrate that portent has, regrettably, become reality.
The Parties’ Conduct
10. On several occasions, Fleming, her family and their guests parked their motor vehicles along the common driveway. The motor vehicles were, variously, located (a) on the paving, parallel to and abutting the right edge of the common driveway, (b) on the grass easement, parallel to and abutting the right edge of the common driveway and (c) in Fleming’s private driveway with the vehicles’ rear ends slightly extending into the common driveway. In none of those instances did Fleming’s vehicles preclude or impede pedestrian or vehicular passage along the common driveway.
11. On the occasions when vehicles, operated by Fleming, her family, or their guests were located on the grass easement, some minimal damage was done to the grass by the vehicles’ tires.
12. The lawn seeding, contemplated by the purchase and sale agreement to be provided by Quinlivan, was unsuccessful due to the weather conditions that prevailed through Spring, 1997.
13. The trees, planted by Quinlivan roughly upon the south boundary of Fleming’s Lot 1, failed as did their replacements. No evidence was adduced as to whether Quinlivan warranted the growth of those trees or otherwise bore the responsibility for their survival.
14. Through March and April 1997, Quinlivan complained to Fleming with respect to damage to easement grass allegedly caused by vehicles driven by persons attending functions at Fleming’s house. Quinlivan also asserted grass damage from Fleming’s snow removal efforts. Fleming offered to repair any grass damage, but Quinlivan rejected her offer on grounds *580 that he could not be sure that whoever effected the repairs was insured. Additionally, Quinlivan notified the guests of Fleming, the operators of the “offending” vehicles, seeking their contributions to his grass repair efforts and threatening to notify their insurers should they decline.
15. Hostilities continued through May 31, 1997, when a guest at Fleming’s daughter’s graduation party parked along the common driveway. Quinlivan mounted a menacing surveillance from his vehicle and observed that five more guests parked their vehicles along the common driveway. Fleming sought to speak to Quinlivan in his vehicular redoubt, but he declined to engage in any discussion with her. Fleming then realigned the offending vehicles in her private driveway. There was no evidence that the vehicles had impeded pedestrian or vehicular passage along the common driveway.
16. Similar incidents occurred from November 1997, through December 1999. More particularly:
November 21, 1997 — Quinlivan called the police because Fleming’s son, a guest at his sister’s birthday party, had allegedly parked his car on the common driveway; at the request of the police, the son repositioned his vehicle in Fleming’s private driveway. The vehicle had not impeded vehicular or pedestrian ingress or egress along the common driveway.
May 5, 1998 — Quinlivan called a tow truck to remove Fleming’s son’s vehicle, which had been parked partially on the common driveway because a service vehicle was occupying the private driveway. The tow truck desisted at Fleming’s request.
July 16, 1998 — A police officer informed Fleming that a vehicle had been reported to be in the common driveway; the vehicle, operated by a friend of Fleming’s daughter, had already departed.
December 25, 1999 — The police informed Fleming that they had been requested to tow a vehicle owned by a Fleming guest and parked at the Hill Street end of the common driveway; the vehicle was not blocking pedestrian egress or ingress, but the guest moved the vehicle in response to the police request.
17. Fleming has, to date, satisfied her contractual obligation to pay one-third of the costs of snow removal from the common driveway.
18. Quinlivan was not contractually obligated to provide successful development of greenery beyond the initial installation of grass seed and shrubbery.[7] See paragraphs 8 and 9, Exhibit “D,” Purchase and Sale Agreement (Exhibit 1).
19. Fleming has not paid her contractually mandated one-third share of the cost of maintenance of the landscaped portion of the easement; Quinlivan paid Fleming’s share to the maintenance vendors pending the resolution of the instant disputes.
20. Nothing in the deed, the declaration of easement, or the original declaration of restrictive covenants expressly precludes the parking of motor vehicles upon the common driveway.
21. On July 11, 1997, Quinlivan conveyed Lot No. 1 to his wife, Elizabeth, subject to the November 20, 1996, Declaration of Restrictive Covenants.
22. On June 2, 1998, Elizabeth executed a “First (sic) Amendment to Declaration of Restrictive Covenants” which mirrored the language of the “First Amendment to Declaration of Restrictive Covenants” executed by Quinlivan on October 17, 1997.
23. During the summers of 1999 and 2000, Quinlivan trained a video camera from his second-floor bedroom upon the common driveway and upon Fleming’s deck and back yard. The camera was operated for 15 to 40 minutes at a time on a great number of occasions, prompting sarcastic salutes from Fleming, but recording no evidence material to this cause.
CONCLUSIONS
Based upon the facts found supra and guided by the arguments of counsel, the court will dispose of the surviving claims and counterclaims as follows.
FLEMING’S COMPLAINT
Count I (Seeking Declaratory Judgment and Injunctive Relief)
Because the Declaration of Easement recited that its purpose, with respect to the common driveway component of the easement, was, in pertinent part, to provide “for pedestrian and vehicular ingress and egress . . . over and across the common drive to and from Hill Street and to and from Lots 1, 2 and 3,” this court concludes that nothing in the Declaration of Easement precludes the parking of motor vehicles along the common driveway in a manner that does not impede pedestrian and vehicular passage thereupon. Furthermore, the fact that the original Declaration of Restrictive Covenants did not address the issue of parking along the common driveway is persuasive that the parties did not then view non-impeding parking as prohibited by deed, easement, or otherwise.
The several amendments to the Declaration of Restrictive Covenants did purport to bar all parking, including that which did not impede pedestrian or vehicular ingress and egress, but those amendments are of suspect efficacy. First, the amendment executed by Quinlivan on October 21, 1997, was subsequent to his July 11, 1997 conveyance of title to Lots 2 and 3 to Elizabeth. Quinlivan was, therefore, without power and authority to amend the original Declaration of Restrictive Covenants.[8] Second, circumstances incident to the transfer of title to Lots 2 and 3 from Quinlivan to Elizabeth for “less than one hundred dollars” and her recordation of “First Amendment” to the restrictive covenants, in terms identical to Quinlivan’s inefficacious attempt to amend, suggest *581 that Elizabeth’s attempt was solely an effort to remedy the ultra vires amendment by Quinlivan. Third, the employment, nearly two years postfacto, of the device of an amendment to a restrictive covenant to diminish substantially the rights conveyed by an easement— which rights constituted the benefit of the bargain obtained in an arms’-length real estate transaction — is heavy with inequity. And, finally, when we recognize that the original Declaration of Restrictive Covenants expressly concerned itself only with “Architectural Control,” the amendment’s unilateral realignment of the focus of the restrictions from architectural considerations to parking prohibitions in a manner that substantially diminishes the value of Lot 1[9] seems an attempt to fit a size ten foot into a size six shoe. At bottom, Quinlivan’s argument — that the amendments) ought to be permitted to cure the omissions in the original Declarations of Easement and Restrictive Covenants — is just not consonant with equitable principles.[10]
Judgment will, therefore, enter upon Count I in favor of Fleming. The terms of the declaratory judgment shall be as recited in paragraph 3 of Fleming’s Count I prayer for relief, and the terms of the permanent injunction shall be as recited in paragraph 1 of Fleming’s Count I prayer for relief.
Count II (Seeking Damages for the Intentional Infliction of Emotional Distress)
The conduct of Quinlivan, while surpassingly unneighborly and generally boorish, was not “extreme and outrageous . . . beyond all possible bounds of decency . . . utterly intolerable in civilized community . . .,” was not shown to have been intended, actually or constructively, to visit emotional harm upon Fleming and did not result in distress so “severe . . . that no reasonable [woman] could be expected to endure it.” See Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).
Judgment will, therefore, enter upon Count II in favor of Quinlivan.
Count III (Seeking Damages, Costs, and Attorneys Fees for Breach of Warranty) '
The warranty component of the purchase and sales agreement[11] obligated Quinlivan to use “quality seed” in grassing Lot 1, but placed upon Fleming “the responsibility for germination of seed and successful growth of grass ...” With respect to trees, Quinlivan was required only to provide “alive and healthy [trees] when planted”; the agreement further specified, “no warranty exists as to the length of life.” This court received no compelling evidence that other than “quality” grass seed was employed by Quinlivan or that trees were infirm when planted. Accordingly, the evidence is insufficient to demonstrate a breach of the warranty contained in the purchase and sale agreement.
Although Fleming has argued that the November 4, 1996, memorandum of “Open Items/Oral Representations” constitutes an assumption by Quinlivan of a duty to provide her with a "seeded and germinated lawn by May 31st (sic) 1997, if not sooner, dependent upon weather [and] temperature conditions” (Exhibit 2), the assumption, if such it were, did not find its way into the November 20, 1996, purchase and sale agreement. The broad obligations, created by the memorandum, are superceded by the less onerous demands of the subsequent agreement with which, as noted supra, Quinlivan’s performance was in compliance. And, even should we agree, arguendo, that the memorandum constitutes an enforceable contract, its conditions precedent, to wit, cooperative weather and temperature, have not been shown by the evidence at bar to have occurred.
Judgment will enter upon Count III in favor of Quinlivan.
Count IV (Seeking Damages for Violation of G.L.c. 93A, §§2 and 9)
This count was determined at the close of Fleming’s case by the court’s allowance of Quinlivan’s directed verdict.[12] Accordingly, judgment will enter for Quinlivan upon Court IV.
Count V (Seeking Damages for Trespass)
Fleming withdrew her trespass count at the close of all the evidence.
QUINLIVAN’S COUNTERCLAIM
Count I (Seeking Damages for Trespass)
Quinlivan withdrew his trespass count at the close of all the evidence.
Count II (Seeking Damages for Breach of Covenants)
Because, as noted supra, Fleming’s conduct in parking and permitting parking in a nonimpeding fashion on the common driveway is not violative of either the Declaration of Easement or the Declaration of Restrictive Covenants, as originally drawn and amended, Quinlivan’s allegations of breach of covenants must fail.
Judgment will enter for Fleming upon Count II of the counterclaim.
Count III (Seeking Damages for Negligence)
Because, as noted supra, Fleming’s conduct in and permitting parking in a nonimpeding fashion on the common driveway is an appropriate use by Fleming, and because there is no credible evidence that her conduct breached any duty she may have had not to overburden the easement, she was not negligent in her use of the easement.
Judgment will enter for Fleming upon Count III of the counterclaim.
*582 Count IV (Seeking Damages for Intentional Infliction of Emotional Distress)
The evidence is not persuasive that Fleming’s conduct was intended to inflict emotional injury upon Quinlivan, was extreme and outrageous, was beyond all possible bounds of decency and utterly intolerable in a civilized community, and was productive of severe distress of a sort that no reasonable man could endure. See, generally, Agis v. Howard Johnson Co., 371 Mass. 140 (1976). It is regrettable that, on occasion, Fleming’s verbal approaches to Quinlivan were somewhat provocative, but, even assuming Quinlivan’s uncommon sensitivity and delicacy of spirit, the evidence falls far short of that required to establish the tort of intentional infliction of emotional distress.
Judgment will enter for Fleming upon Count IV of the counterclaim.
Count V (Seeking Damages for Intentional Interference With Contract)
Quinlivan withdrew his interference count at the close of all the evidence.
Count VI (Seeking Damages for Trespass to Chattels)
Quinlivan withdrew his trespass to chattels count at the close of all the evidence.
Count VII (Seeking Damages for Breach of Covenant to Pay Proportionate Share of Maintenance Costs)
Quinlivan seeks to recover from Fleming one-third of the costs of maintenance of the easement, to include lawn care of the flanking grass strips and specified maintenance of the common driveway. The Declaration of Easement provides for such a proportional assessment. (Exhibit 8, paragraph 4.)
The fact that the Declaration also contemplates an annual meeting of lot owners “to discuss and make arrangements for the maintenance and improvement of the common area . . .,’’ id, does not constitute a condition precedent to enforcement of the obligation to remit the proportional payments. This court views the annual meeting requirement as discretionary (“The owners, from time to time . . . shall. . . meet annually . . .” [emphasis added]) and, in context, as pertaining to general policy determinations by the owners. The relatively ministerial tasks of calculating the proportionate shares of easement maintenance costs do not fall, this court finds, within the reach of the annual meeting. Accordingly, the omission of a meeting to ascertain the dollar amount of each lot owner’s obligation under the Declaration of Easement presents no bar to the enforcement of the Declaration’s requirement that costs be shared.
Judgment will enter for Quinlivan upon Count VII of the counterclaim in an amount constituting one-third of the costs of maintaining the easement from the date that Fleming took title to the date of this judgment; said amount shall be determined by agreement of the parties or, failing that, by this court after hearing.
ORDER
Judgment will enter upon the several counts in accordance with this memorandum of decision.

 Count IV was dismissed, upon Quinlivan’s motion, at the close of the presentation of Fleming’s evidence.

 Count v. was withdrawn by Fleming at the close of all the evidence.

 Count I was withdrawn by Quinlivan at the close of all the evidence.

 Count v. was withdrawn by Quinlivan at the close of all the evidence.

 Count VI was withdrawn by Quinlivan at the close of all the evidence.

 Exhibit 8, the Declaration of Easement, does not reflect the exact date of its recordation, but, because the Declaration was referenced in the deed as “recorded herewith," we shall assume that recordation occurred on November 22, 1996.

 This court deems that trees are included within the limited warranty contemplated by the parties with respect to “shrubbery.”

 Although Quinlivan might argue that the language of the original Declaration of Restrictive Covenants empowered the' “grantor” to amend whether or not he retained title, the court regards such a construction as incongruous with the thrust of the documents and as extending the grantor’s authority far beyond its intended limits.

 To require Lot l’s guests and others to park on Hill Street rather than on the common driveway plainly makes Lot 1 a less attractive property.

 It might be suggested that, insofar as Fleming purchased Lot 1 subject to the declarations of easement and restrictive covenants, the latter of which were amendable by Quinlivan, Fleming cannot now protest when Quinlivan alters the easement by amending the restrictive covenants. This court is unpersuaded by the suggestion because nothing in the declaration of restrictive covenants authorizes alteration of the easement through the device of amending the restrictive covenants. To maintain now that Fleming ought to have anticipated such an employment of the covenant-amendment power by Quinlivan is unreasonable. Accordingly, there is no merit to Quinlivan’s position that his amendment to the restrictive covenants effected a binding alteration to the Declaration of Easement such that all parking on the common driveway was thereby precluded.

 See paragraphs 8 and 9, Exhibit “D” of the contract. (Exhibt 1.)

 The court notes, parenthetically, that its finding, supra, for Quinlivan on Fleming’s breach of warranty count would preclude G.L.c. 93A relief based on breach, and that recovery under G.L.c. 93A for an alleged omission to tender a reasonable settlement offer is denied to Fleming under the principles announced in Morrison v. Toys “R”Us, 13 Mass. L. Rptr 134 (Hely, J.) (April 19, 2000); see also Hopkins v. Liberty Mutual Life Insurance Co., 434 Mass. 556, 566-68 (2001), wherein the Supreme Judicial Court underscored the limitation of G.L.c. 93A and G.L.c. 176D to instances in which an “insurer” fails to present a reasonable offer of settlement.